UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
FCS ADVISORS, LLC DBA BREVET CAPITAL ADVISORS,

                    Plaintiff,

   - v. -

RADIATOR CAFÉ, LLC and CIARAN O'BRIEN,

                    Defendants.
-----------------------------------------------------------------------x

Case No.: 25-cv-5699

**COMPLAINT**

Plaintiff FCS Advisors, LLC dba Brevet Capital Advisors ("Brevet" or "Purchaser"), by and through its attorneys, Parker Pohl LLP, as and for its Complaint against Defendants Radiator Café, LLC ("Radiator Café") and Ciaran O'Brien ("O'Brien" or "Guarantor", together with Radiator Café, "Defendants"), alleges as follows:

## NATURE OF THE CASE

1. This action arises from Radiator Café's default on its contractual promise to pay Brevet $198,965.83, plus fees and costs, pursuant to a Brevet Capital Advisors Receivables Purchase Agreement ("Agreement").

2. Radiator Café possessed "Employee Retention Credit Accounts" which entitled it to receive refunds from the IRS for previously paid taxes. Brevet purchased those accounts from Radiator Café and thus obtained the right to receive those refunds from the IRS instead of Radiator Café.

3. To purchase the accounts, Brevet paid Radiator Café $198,965.83, less a finance fee. Radiator Café – under the stewardship of Defendant Ciaran O'Brien, who co-owns and operates Radiator Café – then decided not only to reap the benefit of Brevet's payment, but also to keep the payments it received from the IRS and that it is obligated to pay over to Brevet.

4. Those payments (plus other amounts as detailed below) are currently due and owing to Brevet pursuant to the clear, unconditional terms of the parties' Agreement.

5. Moreover, Defendant O'Brien is the personal guarantor of the company's contractual obligations to Brevet pursuant to a written guaranty (the "<u>Guaranty</u>").

6. Radiator Café – as the primary obligor – has entirely ignored its contractual payment obligations despite due demand.

7. O'Brien – as Guarantor – has similarly refused to comply with his contractual obligations despite due demand.

8. Put simply, Defendants stole Brevet's money.

9. Despite repeated demands over nearly three years, Defendants have offered no legitimate explanation for their failure to remit the IRS refunds to Brevet, nor is there one, and have made a calculated, bad faith decision to wrongfully retain funds that belong to Plaintiff.

10. Brevet brings this action to recover all amounts due and owing, and to hold Defendants accountable for their brazen theft of Brevet's money.

## PARTIES

11. Plaintiff is a limited liability company organized under the laws of Delaware, with its principal place of business at 441 Ninth Avenue, 20th Floor, New York, NY 10001.

12. Defendant Radiator Café is a limited liability company with its principal place of business at 2139 W. 44th Ave., Denver, Colorado 80211.

13. Defendant O'Brien is an individual residing in Denver, Colorado, upon information and belief. O'Brien is a 68% owner of Radiator Café.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity and the amount in controversy exceeds $75,000.

15. Plaintiff FCS Advisors, LLC d/b/a Brevet Capital Advisors is a citizen of New York and has one member, which is a Delaware limited liability company ("DE1"). DE1, in turn, has two individual members, both of whom are citizens of New York, and one entity member, which is a Delaware limited liability company ("DE2"). DE2 has three members: one is an individual who is a citizen of New York, one is an individual who is a citizen of New Jersey, and one is a Delaware limited liability company ("DE3"). DE3 has two members, one individual who is a citizen of New York and one individual who is a citizen of New Jersey.

16. Defendants Radiator Café and O'Brien are citizens of Colorado. Defendant O'Brien has a 68% membership interest in Radiator Café. Upon information and belief, no other member of Radiator Café is a citizen of New York, New Jersey, or Delaware.

17. This Court has personal jurisdiction, and venue is proper, pursuant to Paragraph 25 of the Agreement and Paragraph 10 of the Guaranty. Paragraph 25 of the Agreement states, *inter alia*, that any suit arising out of a breach of the Agreement "shall, if Purchaser so elects, be instituted in the state and federal courts located in the State of New York" and each party "irrevocably and unconditionally" submits to such jurisdiction and "waives any and all objections to jurisdiction or venue" in such jurisdiction. Likewise, pursuant to Paragraph 10 of the Guaranty, the Guarantor "consents to the exclusive jurisdiction of the local, state or federal court located with[in] the State of New York."

18. Venue is also proper under 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to this action occurred in this district.

## FACTS

**Employee Retention Credits**

19. To provide tax relief to businesses impacted by the Coronavirus pandemic in 2020 and 2021, Congress passed legislation providing eligible employers with certain tax credits called

Employee Retention Credits ("ERC"). (Such legislation included the Coronavirus Aid, Relief, and Economic Security Act; the Taxpayer Certainty and Disaster Tax Relief Act of 2020; and the American Rescue Plan Act of 2021).

20. To obtain the credit, eligible employers may seek an IRS refund of previously paid taxes by filing amended tax returns.

21. Many businesses seeking ERC refunds face lengthy wait times. To enable those businesses to receive funds sooner, Brevet purchases the businesses' "Employee Retention Credit Accounts" ("ERC Accounts"), thereby providing the businesses immediate cash in exchange for a finance fee and absolute ownership of the ERC refunds the IRS eventually pays the business, all pursuant to written contracts.

**Brevet's Contract with Radiator Café**

22. On February 24, 2022, Brevet and Radiator Café entered into a Brevet Capital Advisors Receivables Purchase Agreement ("Agreement"), and Brevet and O'Brien entered into a Brevet Capital Advisors Validity Agreement ("Guaranty" and, together with the Agreement, the "Radiator Café Contracts"). The Radiator Café Contracts are attached hereto as Exhibit A.

23. Radiator Café is the "Seller" in the Agreement. (Agreement, Cover Page & ¶ 2.1)

24. The Agreement defines ERC Accounts as:

> all currently existing and hereafter arising amounts owing or to become due to the Seller constituting Employee Retention Tax Credit refunds (as set out in the Coronavirus Aid, Relief, and Economic Security Act, the Taxpayer Certainty and Disaster Tax Relief Act of 2020, and the American Rescue Plan Act of 2021, and any related legislation enacted in the future), together with all amounts, fees, charges, interest and other amounts relating to, arising under or in connection with such accounts.

(*Id.*, ¶ 1 (Definitions) (emphasis added))

25. All such amounts owing, or to become due, on any ERC Account are referred to as the "ERC Claim Amount." (*Id.*)

4

26.     The Agreement's Schedule of Accounts specifies the ERC Accounts Brevet purchased pursuant to the Agreement and their dollar values. (*Id.*, Schedule of Accounts)

27.     The Schedule of Accounts also shows the "ERC Claim Total," which is the aggregate value of the ERC Claim Amounts, i.e., <u>the total value of the credit/refund an eligible employer is entitled to receive from the IRS and which Brevet, in turn, becomes entitled to receive as the Purchaser</u>. (*Id.*)

28.     The "Purchase Price" that Brevet agrees to pay the Seller (in exchange for the right to collect the ERC Claim Total) is the amount equal to the ERC Claim Total minus a "buffer," which is intended to cover certain fees or other potential offsets against or reductions of the ERC Claim Amount, <u>if any</u>. (*See id.*, ¶1, ¶ 2.4)

29.     Brevet then subtracts a 10% "Finance Fee" from the Purchase Price (a nominal return to Brevet) yielding a "Cash Payment to Seller." (*Id.*, Schedule of Accounts)

**Brevet Purchases the ERC Accounts from Radiator Café**

30.     On February 24, 2022, Brevet purchased six ERC Accounts from Radiator Café with an ERC Claim Total of $221,063.14 ("<u>Radiator Café Purchased Accounts</u>"), for the total Purchase Price of $198,956.83 after deducting Brevet's finance fee. The Schedule of Accounts to the Agreement shows the following calculation of the Purchase Price and Net Proceeds to Seller:

| | |
|---|---:|
| **ERC Claim Total** | $ 221,063.14 |
| (-) Buffer | $ 22,106.31 |
| **Purchase Price** | $ 198,956.83 |
| (-) Finance Fee | $ 22,106.31 |
| **Cash Payment to Seller** | $ 176,850.51 |
| (-) EZ-ERC Invoice | $ 16,579.74 |
| Net Proceeds | $ 160,270.77 |

(*See* <u>Exhibit A</u>, Schedule of Accounts)

31.     Brevet effected the purchase of Radiator Café Purchased Accounts on February 24, 2022 ("<u>Purchase Date</u>"), by wiring $176,850.51 to Radiator Café.

5

32. Brevet also paid an EZ ERC Invoice in the amount of $16,579.74, on Radiator Café's behalf and at Radiator Café's direction. (*Id.*)

33. Upon payment of the Purchase Price, Brevet became the "absolute owner" of the ERC Accounts. (Agreement, ¶ 2.1.2)

34. As the "absolute owner," Brevet has the absolute right to payment of any and all refunds the IRS sends to the Seller related to the ERC Accounts: "[T]he Purchased Accounts are and will remain *unconditionally owed and will be paid to Purchaser and are not subject to any disputes, offsets, set-offs, counterclaims, or cancellation.*" (*Id*., ¶ 9.6 (emphasis added); *see also* Schedule of Accounts, Seller's Representations and Warranties (reiterating that "the Accepted Accounts are and shall remaining unconditionally owed and will be paid to Purchaser without defenses, disputes, offsets, or counterclaims"))

**Defendants' Obligations Under the Agreement and the Guaranty**

35. Radiator Café's obligations to ensure payment to Brevet (either directly from the IRS or from Radiator Café, if it receives the refunds from the IRS), include:

- Taking "all actions necessary to direct any and all payments from the IRS Account Debtor to Purchaser, including, at the request of Purchaser, communicating with the IRS Account Debtor and/or as referenced in Section 6.3 hereof, as instructed by Purchaser" (*Id.,* ¶ 2.2);

- Instructing "the IRS Account Debtor, whether through a payroll provider or otherwise, to pay such ERC Claim to the Purchase Depository, as detailed in Schedule A herein" (*Id.*, ¶ 6.3);

- Paying "the amount of any payment on account of a Purchased Account received by Seller to Purchaser within 3 business days following date of the receipt thereof by Seller" (*Id.,* ¶ 6.7); and

- Directing the IRS "to send all payments relating to the Purchased Accounts to [Brevet's] lockbox address specified in Schedule A (by any means necessary . . . ) until [Brevet] has received funds in an amount equal to the total Purchase Price of all Purchased Accounts as well as all fees and expenses due and payable to Purchaser" (*Id.,* ¶ 6.11).

6

36. The Agreement also requires Radiator Café to provide access to "all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records . . . ." (*Id*. ¶ 6.2)

37. Moreover, Radiator Café "irrevocably authorizes all accountants and third parties to disclose and deliver to [Brevet] at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller." (*Id*.)

38. The Agreement identifies multiple Events of Default, including if:

- "Seller defaults in the payment of any Obligations, or in the performance of any provision hereof . . ." (Agreement, ¶ 10.1(a));

- "Seller is in breach of any covenants listed in Section 6 herein" (which includes the obligation to pay any amounts of the Purchased Accounts received by Radiator Café within 3 days of receipt) (*Id*., ¶ 10.1(g)); and

- Seller fails "to remit any amounts paid to Seller by the IRS Account Debtor with respect to a Purchased Account to Purchaser within 3 business days." (*Id.,* ¶ 10.1(h)).

39. An Event of Default, among other rights, gives Brevet the right to terminate the Agreement, at which time all Obligations become immediately due and owing. (*Id*., ¶ 10.2)

40. Any Purchased Account that remains unpaid beyond 365 days from the Purchase Date begins to accrue a 1.0% Late Payment Fee accruing each month (*see id.,* ¶ 1 (Late Payment Date definition); ¶ 3.2 (late payment fee provision)), and an Event of Default causes the immediate accrual of a 3.0% default fee (*id.,* ¶ 10.2).

41. Brevet also has the right to require Seller to repurchase, "by payment of the unpaid Purchase Price . . . Any Purchased Account that remains unpaid fifteen (15) months after the Purchase Date of such ERC Account." (*Id.,* ¶ 4.1.5)

7

42. Finally, the Agreement contains a broad General Release in favor of Brevet, releasing Brevet from any and all claims "to the extent that they arise out of or are in [any] way connected to or are related to Seller' [sic] relationship with Purchaser." (*Id.*, ¶ 27)

43. The Guaranty provides, as relevant, that the Guarantor "unconditionally guaranties, warrants and covenants that . . . the amount of each Purchased Account is due and owing to Company and represents an accurate statement of a bona fide IRS tax refund." (Guaranty, ¶ 1) The Guaranty also provides that if the Seller or Guarantor receives any payment on the accounts purchased by Brevet:

> whether payment is by an instrument made payable to Brevet Capital Advisors, Company or otherwise, neither Company *nor such Validity Guarantor will deposit or seek to negotiate the payment and will insure that such payment is* delivered only to Brevet Capital Advisors, and Company or such Validity Guarantor will turn over any such payment to Brevet Capital Advisors within 3 days of receipt in the original form payment was received. *Until delivery to Brevet Capital Advisors, such payment shall be held in trust for the sole and exclusive benefit of Brevet Capital Advisors.*

(*Id.*, ¶ 2 (emphasis added))

44. Guarantor further agrees to indemnify and hold Brevet harmless (i) from any damage, loss, claim or liability Brevet "may sustain or incur as a result of any breach of the warranties or covenants set forth" in the Guaranty, and (2) for Radiator Café "failing or refusing … to comply with the provisions of the Purchase Documents," and "to be liable for claims arising out of any such Breach." (*Id.*)

45. Guarantor waives "any and all defenses available to a surety, guarantor or accommodation co-obligor until the Obligations are indefeasibly paid in full in cash." (*id.,* ¶ 4), and the Guarantor's obligations are joint and several (*id.*, ¶ 12).

46. Finally, Brevet is entitled to all costs and expenses, including attorneys' fees, incurred in enforcing the Agreement or the Guaranty. (Agreement, ¶ 14.2, Guaranty, ¶ 7)

8

**Radiator Café Is In Default Under the Agreement and O'Brien Is In Breach of the Guaranty**

47. Radiator Café received payment from the IRS totaling at least $221,063.14 on the ERC Accounts identified in the Agreement.

48. Indeed, in emails between June 23, 2022 and December 19, 2022, O'Brien admitted that Radiator Café had received refund checks from the IRS. (A true and correct copy of a 2022 email chain with O'Brien and Robert Waldman of Brevet is attached hereto as Exhibit B.)

49. Radiator Café has failed to remit any of those payments to Plaintiff, as required under the Agreement.

50. In breach of the Agreement, Radiator Café has engaged in several wrongful acts, each of which constitutes an Event of Default under Paragraphs 10.1(a), (g), and (h) of the Agreement. Those acts include, without limitation:

    a. failing to direct the IRS to send all payments relating to the Purchased Accounts to Brevet, in breach of Paragraphs 6.3 and 6.7; and

    b. receiving payments on the Purchased Accounts directly from the IRS but failing to make payment to Brevet within 3 business days of receipt, in breach of Paragraph 6.7 of the Agreement.

51. Despite his express obligations under the Guaranty to hold any such payments in trust for Brevet's sole benefit, O'Brien deposited and/or negotiated payments from the IRS and has refused to turn them over to Brevet (within 3 days of receipt or otherwise). O'Brien has also refused to indemnify Brevet for Radiator Café's breaches of the Agreement. The foregoing is in breach of Paragraph 2 of the Guaranty.

**Brevet Notifies Defendants of Default and Demands Payment Numerous Times Between 2022 and 2025**

52. By email dated November 18, 2022, Brevet advised Radiator Café that it was in default under the Agreement. (*See* Exhibit B.)

9

53. By email dated January 6, 2023, Benjamin Thomas of Boston Portfolio Advisors, writing on behalf of Brevet, again advised O'Brien that Radiator Café was in default under the Agreement and demanded payment of the amount due by January 13, 2023. (A true and correct copy of a 2023 email chain with O'Brien and various representatives of Brevet is attached hereto as Exhibit C.)

54. Also on January 6, 2023, Brevet sent Radiator Café a letter, informing it of its default and making demand for payment. (A true and correct copy of the January 6, 2023 letter from Brevet to Radiator Café is attached hereto as Exhibit D.)

55. Radiator Café did not make payment in response to the January 6, 2023 email or letter.

56. Brevet sent follow-up emails demanding payment on April 28, 2023 and May 12, 2023. O'Brien responded to the May 12, 2023 email but did not make payment. (*See* Exhibit C)

57. By letter dated June 17, 2025, Brevet, through counsel, again notified Radiator Café that it was in default under the Agreement and demanded payment of the Purchase Price owed thereunder. As of the date of this filing, Radiator Café has failed and refused to make such payment. (A true and correct copy of the June 17, 2025 letter from Parker Pohl LLP to Radiator Café is attached hereto as Exhibit E.)

58. The June 17, 2025 letter also notified O'Brien (as Guarantor of Radiator Café's obligations under the Agreement) that he was in breach of the Guaranty and demanded payment from him. (*See* Exhibit E) As of the date of this filing, O'Brien has failed and refused to make payment to or otherwise indemnify Brevet.

59. As of the date of this filing, Radiator Café owes Brevet not less than $260,633.44 under the Agreement – comprised of the initial Purchase Price of $198,956.83, Late Payment Fees in the amount of $55,707.91 (which are continuing to accrue), and a 3% Default Fee of $5,968.70 – plus attorneys' fees and costs and interest in amounts to be determined.

## FIRST CAUSE OF ACTION
**(Breach of Agreement – Against Defendant Radiator Café)**

60. Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

61. The Agreement is a valid and existing contract between Plaintiff, on the one hand, and Defendant Radiator Café on the other.

62. Plaintiff performed all of its obligations under the Agreement.

63. Radiator Café has breached its obligations under the Agreement by, inter alia, failing to repurchase the Purchased Accounts upon due demand after those accounts remained unpaid for more than fifteen months.

64. Radiator Café has breached its obligations under the Agreement by receiving funds from the IRS that the Agreement requires it to pay over to Brevet with 3 days of receipt and failing to pay those funds over to Brevet.

65. As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but believed to be not less than USD $260,633.44 (*see above*, ¶ 56), plus attorneys' fees and costs and interest in amounts to be determined.

## SECOND CAUSE OF ACTION
**(Breach of Guaranty – Against Defendant O'Brien)**

66. Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

67. The Guaranty is a valid and existing contract between Brevet, on the one hand, and Defendant O'Brien as Guarantor on the other.

68. Plaintiff performed all of its obligations under the Guaranty.

69. Pursuant to the Guaranty, O'Brien as Guarantor is liable for all amounts that Radiator Café has failed to pay under the Agreement.

70. O'Brien has breached his obligations as Guarantor under the Guaranty by failing to pay to Brevet amounts due under the Agreement.

11

71. As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but believed to be not less than USD $260,633.44 (*see above*, ¶ 56), plus attorneys' fees and costs and interest in amounts to be determined.

### THIRD CAUSE OF ACTION
**(Conversion – Against Both Defendants)**
**(In the Alternative to Plaintiff's First and Second Claims)**

72. Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

73. Plaintiff owns, possesses, and controls the right to receive payments from the IRS on account of the accounts it purchases from Radiator Café.

74. Upon information and belief, Defendants have received payments of specific funds in an amount believed to be not less than $221,063.14 from the IRS on account of the Radiator Café Purchased Accounts – payments that rightfully belong to Plaintiff.

75. Said funds are identifiably Plaintiff's property based on the terms of the Agreement and the payments made by the IRS, and Radiator Café and O'Brien were obligated to segregate them for Plaintiff's benefit.

76. Defendants knew the funds belonged to Plaintiff when they received them and they have wrongfully misappropriated those funds for their own purposes and own benefit.

77. Defendants thus wrongfully engaged in the assumption and exercise of the right of ownership over funds that rightfully belong to Plaintiff.

78. Defendants are engaged in unauthorized dominion over Plaintiff's funds, to the exclusion of Plaintiff's rights.

79. Defendants Radiator Café and O'Brien, together or individually, currently possess the funds that rightfully belong to Plaintiff.

80. Defendants intend to permanently deprive Plaintiff of the funds.

81. As a result of Defendants' wrongful conduct, Plaintiff has been damaged in an amount to be determined at trial but believed to be not less than $260,633.44. In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

### FOURTH CAUSE OF ACTION
### (Unjust Enrichment Against All Defendants)
### (In the Alternative to Plaintiff's Breach of Contract and Guaranty Claims)

82. Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

83. Plaintiff conferred benefits upon Defendant Radiator Café in the form of payment of the agreed-upon Purchase Price, directly to Defendant Radiator Café or to third parties on its behalf and at its direction.

84. By payment of the Purchase Price, Brevet obtained certain rights, namely the right to receive any IRS refund issued on the ERC Accounts and/or to have Defendant Radiator Café or O'Brien pay over any IRS refunds to Brevet received by Radiator Café.

85. Radiator Café and/or O'Brien have received the IRS refunds but have refused to turn them over to Brevet, despite due demand.

86. Defendants have unlawfully enriched themselves at Brevet's expense by unlawfully retaining (or retaining the benefit of) both the Purchase Price paid by Brevet and the IRS refunds issued to Radiator Café to which Brevet it rightfully entitled.

87. It would be against equity and good conscience to permit Defendants to retain a double payment, namely the Purchase Price paid for the ERC Accounts by Brevet and the IRS refunds they received for those same ERC Accounts.

88. As a result, Brevet is entitled to all available damages and relief.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, as follows:

A. Monetary damages against Defendants in an amount to be determined at trial which, as of the date of this filing, amounts to not less than USD $260,633.44, plus attorneys' fees, costs, and interest;

B. Attorney's fees and costs pursuant to the contractual fee-shifting provisions in the relevant agreements;

C. Punitive damages for Defendants' gross, wanton, willful and/or morally culpable conduct;

D. Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

E. Such other and further relief that this Court may deem just and proper.

Dated: New York, New York  **PARKER POHL LLP**
July 10, 2025

By: /s/ *M. Todd Parker*
    M. Todd Parker
    Wendy W. Tannenbaum
99 Park Avenue, Suite 1510
New York, New York 10016
(212) 203-8915
todd.parker@parkerpohl.com
wendy.tannenbaum@parkerpohl.com

*Attorneys for Plaintiff*